632 P.2d 987

Clint MILLER, Plaintiff-Appellant,

v.

ARNAL CORPORATION, dba The Arizona Snow Bowl, Defendant-Appellee.

No. 1 CA–CIV 4796.

Court of Appeals of Arizona,
Division 1,
Department C.

June 4, 1981.

Rehearing Denied June 30, 1981.

Review Denied July 21, 1981.

Gust, Rosenfeld, Divelbess & Henderson by James F. Henderson, Dean G. Kallenbach, Phoenix, for plaintiff-appellant.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Richard McC. Shannon, Phoenix, for defendant-appellee.

## OPINION

O'CONNOR, Presiding Judge.

This is an appeal from a denial of a motion for new trial following a jury verdict against the appellant and in favor of appellee in an action alleging that the appellee willfully, negligently, and unreasonably terminated a rescue effort to assist the appellant. The appeal raises the issue of whether certain jury instructions were

properly refused by the trial court. We find no error and affirm the orders of the trial court.

The appellant, Clint Miller, and five companions hiked on Humphrey's Peak in the mountains near Flagstaff, Arizona, in December, 1972. The group assembled for the hike in the parking lot of the Snow Bowl ski area and camped out overnight nearby on December 30, 1972. The next morning, they began their hike and set up camp for the night of December 31 in a ravine at an elevation of approximately 11,200 to 11,500 feet. During the night a severe storm developed, with high winds, blowing snow and extremely low temperatures. Much of the group's shelter and equipment was lost or destroyed in the storm. The following morning, four members of the group, including Douglas Rickard, decided to descend the mountain and to return to the Snow Bowl and try to obtain assistance for Mr. Miller and another companion, Allison Clay. Mr. Miller had suffered from exposure and frostbite during the preceding night and he did not want to attempt to walk down the mountain. Ms. Clay decided to remain with Mr. Miller.

The four who left the campsite arrived at the Snow Bowl Lodge at approximately 1:45 P.M. on January 1, 1973. They contacted Danny Rich, the assistant Director of the ski patrol, and told him of the predicament of Mr. Miller and Ms. Clay. Rich was a member of the ski patrol and an employee of the Snow Bowl, which was owned and operated by appellee, Arnal Corporation. Rich asked several other ski patrolmen whether they wanted to volunteer for the rescue attempt and told them to begin gathering their equipment and warm clothing. He also telephoned the Coconino County Sheriff's office to obtain assistance from their search and rescue unit. Rickard told Rich that the appellant and Ms. Clay were camped somewhere near the top of the chair life, indicating what he believed to be the general area on a map Rich showed him. In fact, the appellant's location was a substantial distance farther around the mountain. Rich planned to use the ski chair lift to ascend the mountain, and then traverse on skis over to the stranded hikers. However, another storm was developing and the wind was blowing so hard that the chair lift had been shut off. Rich asked his supervisor, Dave Kuntzleman, the appellee corporation's mountain manager, to start the ski lift for the rescue party to ascend. Kuntzleman refused on the ground that it was too dangerous in the existing high winds and he thought the chair lift cable might derail, and also because he wanted the ski patrol to remain on duty to protect skiers on Snow Bowl property. In making his decision, Kuntzleman testified that he was aware the hikers could suffer serious harm or death if they were forced to spend another night on the mountain. An argument ensued between Rich and Kuntzleman, but Kuntzleman refused to start the lift.

The Coconino County Sheriff's search and rescue party did not arrive at the Snow Bowl until approximately 5:30 P.M. Efforts were made to reach the two stranded hikers but the rescuers did not reach them until early morning on January 2. The storm during the night of January 1 was more severe than on the previous night. On arrival, the rescuers found appellant, Miller, in serious condition with hypothermia and frostbite; Ms. Clay had frozen to death. As a result of his exposure, Mr. Miller lost all ten toes, other portions of both feet, and all the fingers of his right hand.

■ Appellant's first contention is that the trial court erred in failing to submit his requested instruction 14 to the jury. It reads as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if the harm is suffered because of the other's reliance upon the undertaking.

The requested instruction is taken directly from *Restatement (Second) of Torts* § 323 dealing with negligent performance of an undertaking to render services.[1] Appellant contends that he was put in a worse position by appellee's termination of a rescue attempt by its own ski patrol and the jury should have been allowed to compensate him for his loss of the chance of being rescued by the ski patrol.

Appellant concedes that the law presently imposes no liability upon those who stand idly by and fail to rescue a stranger who is in danger. *See, e. g., Union Pacific Ry. Co. v. Cappier*, 66 Kan. 649, 72 P. 281 (1903); *Buch v. Amory Mfg. Co.*, 69 N.H. 257, 44 A. 809 (1897); *Yania v. Bigan*, 397 Pa. 316, 155 A.2d 343 (1959). *See also* Annot., 33 A.L. R.3d 301 (1970); M. Shapo, *The Duty to Act* (1977); G. Gordon, *Moral Challenge to the Legal Doctrine of Rescue*, 14 Cleveland-Marshall L.Rev. 334 (1965); Note, *The Failure to Rescue: A Comparative Study*, 52 Columbia L.Rev. 631 (1952); Note, *The Duty to Rescue*, 47 Ind.L.J. 321 (1972); Comment, *The Duty to Rescue*, 28 U. of Pitts.L.Rev. 61 (1966).

W. Prosser, *Handbook of the Law of Torts* § 56 at 341–42 (4th ed. 1971) explains the general rule as follows:

> Thus far the difficulties of setting any standards of unselfish service to fellow men, and of making any workable rule to cover possible situations where fifty people might fail to rescue one, has limited any tendency to depart from the rule to cases where some special relation between the parties has afforded a justification for the creation of a duty, without any question of setting up a rule of universal application. Thus a carrier has been required to take reasonable affirmative steps to aid a passenger in peril, and an innkeeper to aid his guest. Maritime law has long recognized the duty of a ship to save its seaman who has fallen overboard; and there is now quite a general tendency to extend the same duty to any employer when his employee is injured or endangered in the course of his employment. There is now respectable authority imposing the same duty upon a shopkeeper to his business visitor, upon a host to his social guest, upon a jailer to his prisoner, and upon a school to its pupil. There are undoubtedly other relations calling for the same conclusion. (footnotes omitted)[2]

As noted by appellant, some states have created statutory duties to render assistance in certain circumstances. *See, e. g.*, A.R.S. § 28–663 (duty of a motorist involved in an accident to render aid to persons injured in the accident). The Arizona Legislature has also limited the liability of persons who render "emergency care" gratuitously and in good faith to circumstances of *gross* rather than ordinary negligence, whether liability is alleged to exist as a result of an act or a failure to act. A.R.S. § 32–1471.[3] The purpose of A.R.S. § 32–1471 has been described as follows:

---

1. *Restatement (Second) of Torts* § 323, at 135, reads as follows:

    One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

    (1) his failure to exercise such care increases the risk of such harm, or

    (2) the harm is suffered because of the other's reliance upon the undertaking.

2. For an example of another situation creating a duty to aid, *see Maldonado v. Southern Pacific Transportation Co.*, 129 Ariz. 165, 629 P.2d 1001 (App.1981), holding that the complaint stated a cause of action for breach of a duty to render reasonable aid under *Restatement (Second) of Torts* § 322, where the plaintiff was allegedly injured by an instrumentality under the defendant's control. However, the court affirmed the dismissal of a claim for interference with third party rescuers, holding that the complaint alleged at most an attempt to prevent the rendering of aid.

    The instant case is clearly distinguishable as to the duty to aid because appellant was injured by the weather, not by any instrumentality under appellee's control. Appellant's claim for interference with a rescuer is discussed *infra*.

3. A.R.S. § 32–1471 was amended in 1978, after the decision in *Barnum v. Rural Fire Protection Co.*, 24 Ariz.App. 233, 537 P.2d 618 (1975). The amendment changed an initial list of doc-

The apparent purpose of this statute is to relieve the burden of liability on individuals who choose to or not to render aid to others in emergency situations.... An individual may in good faith help another in a crisis with untoward results for which he should not be penalized or the same person may not help, perhaps knowing that he lacks the necessary expertise to be of aid.

*Guerrero v. Copper Queen Hospital*, 112 Ariz. 104, 106, 537 P.2d 1329, 1331 (1975).

The applicability of this statute to a case such as this has not been decided by the Arizona courts, although the language has been described in one case as "notably broad." *See Barnum v. Rural Fire Protection Co.*, 24 Ariz.App. 233, 237 n.1, 537 P.2d 618, 622 n.1 (1975). However, the *Barnum* opinion cites with approval *Restatement (Second) of Torts* § 323. It holds that reliance is a necessary element for recovery against a volunteer, and that the element of reliance "bespeaks a voluntary choice of conduct by the person harmed. It infers that the person exercising it can decide between available alternatives." *Id.* at 237, 537 P.2d at 622.

Comment (a) to § 323 reads in part as follows:

This Section applies to any undertaking to render services to another which the defendant should recognize as necessary for the protection of the other's person or things. It applies whether the harm to the other or his things results from the defendant's negligent conduct in the manner of his performance of the undertaking, or from his failure to exercise reasonable care to complete it or to protect the other when he discontinues it. It applies both to undertakings for a consideration, and to those which are gratuitous.

Comment (c) to § 323 deals with termination of services once begun, and it reads:

The fact that the actor gratuitously starts in to aid another does not necessarily require him to continue his services. He is not required to continue them indefinitely, or even until he has done everything in his power to aid and protect the other. *The actor may normally abandon his efforts at any time unless, by giving the aid, he has put the other in a worse position than he was in before the actor attempted to aid him.* His motives in discontinuing the services are immaterial. It is not necessary for him to justify his failure to continue the services by proving a privilege to do so, based upon his private concerns which would suffer from the continuance of the service. He may without liability discontinue the services through mere caprice, or because of personal dislike or enmity toward the other.

Where, however, the actor's assistance has put the other in a worse position than he was in before, either because the actual danger of harm to the other has been increased by the partial performance, or because the other, in reliance upon the undertaking, has been induced to forego other opportunities of obtaining assistance, the actor is not free to discontinue his services where a reasonable man would not do so. He will then be required to exercise reasonable care to terminate his services in such a manner that there is no unreasonable risk of harm to the other, or to continue them until they can be so terminated. [emphasis added]

The trial court instructed the jury concerning the abandonment or termination of

tors and nurses to read "Any health care provider," but did not otherwise alter the wording of the statute from that considered by the *Barnum* court. The section now provides:

Any health care provider licensed or certified to practice as such in this state or elsewhere, or a licensed ambulance attendant, driver or pilot as defined in § 41–1831, or any other person who renders emergency care at a public gathering or at the scene of an emer-

gency occurrence gratuitously and in good faith shall not be liable for any civil or other damages as the result of any act or omission by such person rendering the emergency care, or as the result of any act or failure to act to provide or arrange for further medical treatment or care for the injured persons, unless such person, while rendering such emergency care, is guilty of gross negligence.

rescue services in its instruction number 1, which incorporates much of the language of comment (c) quoted above.[4]

We believe the trial court properly refused to give appellant's requested instruction 14 for several reasons. Appellant did not claim that his injuries were caused by the negligent performance by appellee of any duty owed to appellant, but rather claimed that his injuries were exacerbated by a termination of the initial plans and arrangements being made by the ski patrol to attempt his rescue. The *Restatement (Second) of Torts* § 323 explanation in comment (c) concerning termination or abandonment of rescue efforts was in fact incorporated into the court's instruction 1, which correctly and adequately covered the alleged wrong, namely, an unreasonable termination of rescue services. Moreover, we believe that any instruction concerning negligent performance of an undertaking to render services under these circumstances would have to be limited to acts or omissions amounting to gross negligence as required by A.R.S. § 32–1471. Appellant's requested instruction was based on a standard of ordinary negligence alone.

■ In determining whether an instruction is justified, we must consider the evidence in the strongest possible manner in support of the theory of the party asking for the instruction. *Evans v. Pickett*, 102 Ariz. 393, 430 P.2d 413 (1967). Even viewed in this light, there is no evidence that appellant relied on any rescue undertaking by appellee in the sense that he chose rescue by the ski patrol over any other available alternative. Appellant's companions did not rely on appellee by choosing not to pursue other possible avenues of rescue on his behalf. Appellee's employee Rich telephoned the county search and rescue unit almost immediately after appellant's companions arrived at the lodge. The county unit then began organizing equipment and personnel for its rescue attempt. The evidence shows that the county's rescue efforts were not delayed, discouraged, or prevented by any act of appellee's. It is error to instruct in relation to a matter not supported by the evidence. *De Elena v. Southern Pacific Co.*, 121 Ariz. 563, 592 P.2d 759 (1979). Thus, the trial court properly refused to give appellant's requested instruction 14.

■■ Appellant next contends that the trial court erred in refusing to give his requested instructions 2 and 9. They read as follows:

2. Defendant is liable if you find that it unreasonably terminated a rescue attempt once it had begun.

9. The defendant is liable if it began to assist plaintiff, knowing its services were necessary to prevent serious harm to him, and then unreasonably abandoned the effort.

It is not error for the trial court to refuse to give a requested instruction where the subject of the requested instruction was adequately covered by other instructions which were given. *Tucson Utility Supplies, Inc. v. Gallagher*, 102 Ariz. 499, 433 P.2d 629 (1967). Appellant's requested instructions 2

4. Court's instruction number 1 reads:

If the defendant gratuitously started to aid the plaintiff, this does not necessarily require it to continue its services.

Defendant is not required to continue the services indefinitely, or even until it has done everything in its power to aid and protect the plaintiff.

The defendant could abandon its efforts at any time, unless, by giving the aid, it put the plaintiff in a worse position than he was in before the defendant attempted to aid him.

Its motives in discontinuing the services are immaterial. It is not necessary for the defendant to justify its failure to continue the services. If, however, the defendant's assistance put the plaintiff in a worse position than he was in before, either because the actual danger of harm to the plaintiff has been increased by the partial performance, or because the plaintiff or those acting on his behalf, in reliance upon the undertaking, has been induced to forego other opportunities of obtaining assistance, the defendant is not free to discontinue its services where a reasonable man would not do so.

The defendant would then be required to exercise reasonable care to terminate its services in such a manner that there is no unreasonable risk of harm to the plaintiff, or to continue them until they can be so terminated.

and 9 were clearly covered by court's instruction 1, which defined the circumstances in which a rescue effort may be abandoned in accordance with the comment (c) to § 323. In a caveat to § 323, the *Restatement* notes at 135–36:

The Institute expresses no opinion as to whether:

\* \* \* \* \* \*

(2) there may not be other situations in which one may be liable where he has entered upon performance, and cannot withdraw from his undertaking without leaving an unreasonable risk of serious harm to the other.

In comment (e) to § 323 at 139, the caveat is clarified as follows:

The Caveat also leaves open the question whether there may not be cases in which one who has entered on performance of his undertaking, and cannot withdraw from it without leaving an unreasonable risk of serious harm to another, may be subject to liability even though his conduct has induced no reliance and he has in no way increased the risk. Clear authority is lacking, but it is possible that a court may hold that one who has thrown rope to a drowning man, pulled him half way to shore, and then unreasonably abandoned the effort and left him to drown, is liable even though there were no other possible sources of aid, and the situation is made no worse than it was.

Appellant urges us to implement comment (e) to § 323 of the *Restatement* by holding it to be the law in this jurisdiction that a rescue effort, once begun in any manner and in any degree whatsoever, may not thereafter be abandoned or terminated if it would leave the other person with an unreasonable risk of serious harm, even though there has been no reliance on the rescue effort and the extent of the risk has not been increased. We decline to so hold. The trial court properly refused to give appellant's requested instructions 2 and 9.

Next appellant argues that the trial court erred in refusing to give his requested instructions 5 and 8. His requested instruction 5 read as follows:

If you find that defendant prevented or interfered with the rescue of plaintiff, defendant is liable for any harm plaintiff suffered as a result of that prevention or interference.

His requested instruction 8 read:

If defendant intentionally or negligently interfered with the Ski Patrol's efforts to rescue plaintiff, it is liable for any harm suffered by plaintiff as a result of such interference.

Appellant's instructions 5 and 8 were based on §§ 326 and 327, *Restatement (Second) of Torts*, which state that one is liable for physical harm resulting from the intentional or negligent prevention of the giving of aid to another by a third person.[5]

Appellant's instruction 5 inadequately states the law concerning prevention of aid. It is phrased in terms of absolute liability, without indicating that the prevention or interference must be done intentionally or negligently. An instruction which misstates the law is properly rejected. *Travelers Indemnity Co. v. Hudson*, 15 Ariz.App. 371, 488 P.2d 1008 (1971). The trial court properly refused to give appellant's instruction 5.

Appellant's instruction 8 refers to an intentional or negligent interference with a rescue effort. He contends that, as far as

---

5. § 326, *Restatement (Second) of Torts* provides at 145–46:

One who intentionally prevents a third person from giving to another aid necessary to prevent physical harm to him, is subject to liability for physical harm caused to the other by the absence of the aid which he has prevented the third person from giving.

§ 327, *Restatement (Second) of Torts* provides at 146:

One who knows or has reason to know that a third person is giving or is ready to give to another aid necessary to prevent physical harm to him, and negligently prevents or disables the third person from giving such aid, is subject to liability for physical harm caused to the other by the absence of the aid which he has prevented the third person from giving.

this issue is concerned, appellant is in fact two parties although it "prefers to see itself as one entity." In the *Restatement* terms, Kuntzleman is seen as the one who wrongfully prevented the "third person," the ski patrol, from continuing the rescue attempt. Appellant would hold appellee liable for Kuntzleman's act by *respondeat superior.* While appellant concedes that Kuntzleman and the ski patrol members were all employees of Arnal Corporation and that Kuntzleman had the authority to direct the ski patrol's activities, he contends that Kuntzleman nevertheless had no right to interfere with or prevent the proposed rescue operation by the ski patrol.

On the other hand, appellee argues that because Kuntzleman and the ski patrol members were all employees of the corporation, there were only two parties involved, the corporation and the appellant. The corporation could not be said to have "interfered with itself." The corporation did not interfere with an attempt; rather, it chose not to make an attempt. We agree. The *Restatement* sections upon which appellant relies require three parties: an imperilled plaintiff, a rescuer, and one who prevents or interferes with the rescuer. A corporation is an impersonal entity which can act only through its officers and agents. *O'Malley Investment and Realty Co. v. Trimble,* 5 Ariz.App. 10, 422 P.2d 740, *supplemented,* 5 Ariz.App. 434, 427 P.2d 926 (1967). The acts of a corporation's agents are the acts of the corporation. *Tobman v. Cottage Woodcraft Shop,* 194 F.Supp. 83 (S.D.Cal.1961). The concept of a corporation as a separate entity is a legal fact, not a fiction. *Modern Pioneers Ins. Co. v. Nandin,* 103 Ariz. 125, 437 P.2d 658 (1968). In this case one group of corporate employees, the ski patrol, decided to attempt a rescue. A higher-ranking corporate employee, Kuntzleman, told the patrol members that they could not undertake the rescue as they

had planned. The effect was that the corporation as an entity decided, through the interactions of its employees, not to begin a rescue. The corporation cannot be held liable for interfering with a rescue attempt, because it chose not to make any attempt. As discussed above, there is no duty to rescue an endangered stranger. Thus there is no basis upon which to hold appellee liable for interfering with or preventing a rescue attempt.

We also note that, while appellant contends that Kuntzleman and the ski patrol are two distinct parties for purposes of this argument, and although his complaint was originally filed against both the corporation and several individual corporate officers and employees including Kuntzleman, the trial court gave appellant's requested jury instruction 4 which stated in part: "The defendant in this action is Arnal Corporation." Appellant appealed only from the judgment in favor of Arnal Corporation, which is the sole appellee now before us. We believe the trial court correctly concluded that the appellee corporation could not be said to have prevented or interfered with itself in giving or refusing aid to appellant.

Finally, appellant contends the trial court erred in refusing his requested instructions on punitive damages.[6] The jury was properly instructed by the trial court on the elements of a wrongful termination of rescue aid. The jury found in favor of the defendant corporation and against the plaintiff on the underlying claim and it awarded no actual damages to the plaintiff. Therefore, the error of the trial court, if any, in refusing to instruct the jury on punitive damages was harmless, because a plaintiff may not recover punitive damages unless the trier of fact first determines that he is entitled to actual damages. *Hurvitz v.*

---

**6.** Appellant's requested instruction 15 read as follows:

If you find that the defendant did an act or failed to do an act which was its duty to do, knowing or having reason to know of facts from which it could reasonably conclude that its conduct created an unreasonable risk of harm to the plaintiff and involved a high degree of probability that substantial harm would result, the defendant is liable for punitive damages.

*Coburn,* 117 Ariz. 300, 572 P.2d 128 (App. 1977).

The orders of the trial court are affirmed.

WREN and FROEB, JJ., concur.